v. Burke Burns & Pinelli Ltd., Defendant, Appellant. Arguing for the Appellant, Vincent D. Pinelli. Arguing for the Appellant, Patrick J. Williams. Both parties ready to proceed. Yes, Your Honor. Yes, Your Honor. Mr. Pinelli, you may proceed. Thank you. Good morning, Your Honors. As you've just been told, my name is Vincent Pinelli. I'm one of the attorneys for the Defendant, Appellant, the Law Firm, Burke Burns & Pinelli in this matter. Your Honors, the record is clear that the parties in this case entered into unambiguous fee agreements in 1996 and 1997 to represent them, the firm did, to represent them in certain shareholder litigation that was ongoing at that time. Those agreements, in relevant part, had contingent fee arrangements, which basically entitled the firm to 20% of any recovery by settlement or judgment exclusive of a specific sum set forth in the agreements of $325,000 per individual plaintiff. Plaintiffs have... How would you define this fee agreement? Was it a fixed fee, a contingent fee, or a missed, an alternative fee arrangement? Which was it? And when did the settlement accrue in terms of the funds that would be used to pay the balance of the attorneyship? Which is it? Was it a fixed or contingency or a mixed? I think, Judge, it was a mixed agreement because, as you could see from the exhibit of the fee agreement, there was an initial non-refundable retainer of a set amount as part of the attorney time to be known... You're looking at the 1996 agreement? Yes. What? June 20, 1996. That's the agreement that was signed by Plaintiffs Tyke Kim and Yuk Lee. A similar agreement, essentially the same, was signed by Plaintiff Kim by agreement of all the parties that it would essentially be the same agreement as the other two plaintiffs. So they all model each other. That's the 1997 agreement. Yes. That agreement was later voided, correct? It was later voided but then reinstated in the same format as this agreement. So, to be clear, Plaintiff... That was the 2004 agreement which none of the clients signed off on, correct? Not correct, Your Honor. So let me just briefly give you the history here of these agreements. There's really two agreements at issue. Okay. All three of the plaintiffs signed a similar agreement, albeit on different dates. Plaintiffs Kim and Lee in 1996, Plaintiff... um... uh... Kim in 1997. All of them had the same contingent fee provision in them as part of it, and all of them had a offset of a specific dollar amount in them to be used in the calculation. The cases that the firm was hired to represent them on were in 2004. Pursuant to that settlement, a final settlement statement was prepared by the firm and circulated to all the plaintiffs. That settlement statement set forth the amount of fees that the firm said it was owed pursuant to the agreements which said upon recovery or settlement. So, the firm pursuant to the agreement, which is unambiguous, in which the plaintiffs do not challenge as being ambiguous, says that the 20% recovery was due... was upon settlement or judgment. So, that was in 2004. Counsel, I've read all the retaining... retainer agreements in this case, and nowhere do they provide when the value of the property was to be determined for purposes of calculating the 20% fee. And since this case is essentially a recovery in real estate, how can you say that the trial court ruling was against the manifest weight of the evidence? Because, Your Honor, that first of all, with respect to the issue of when the value is to be recovered, that again, in our position, is unambiguous in the provision B that states 20% of any recovery by settlement or judgment. The recovery was the real estate. Real estate has a value, as we all know, on a particular date and time. So, the value was of the real estate as it existed at that point in time. And I say that... Well, that's not... Go ahead, Justice. Well, I'm following up on that. You say that point in time, but the valuation that was used was from five years prior, not the date of the settlement. You did not go out and get an appraisal as of the settlement date, the year that this was settled. So, how can you say that it represented the value as of that date? Because it wasn't just that appraisal. That was part of it that was produced. And that appraisal, as you know, was a court-ordered appraisal. It was done in 1999. The settlement was in 2004. It's well known, and the court can take judicial notice, that the real estate market was on an upward trend from 1999 all the way through 2007 before the market changed. But, in addition to that appraisal, we also provided to the owners evidence of a comparable sale from an appraiser who researched and provided a sale of a property in the immediate vicinity of the subject at or about the date of 2004 that sold for $325,000 an acre. Similar property sold at or about the same time, similar type use. In addition to that, that wasn't the only evidence. There was additional evidence. The owners received offers to purchase the property at or about that time at or about that value of $6 million. Now, it didn't ripen into a transaction for whatever reasons, which we don't know, but the point is that we provided both to the plaintiffs at that time and to the court in this hearing evidence that's generally accepted by all courts in everything from eminent domain cases to all types of property value cases. Evidence of market value of the property. A sale in the vicinity offers for the property an appraisal that could be adjusted, obviously, for the difference in time. Appraisers do retrospective appraisals. There was a difference of opinion as to when the... Counsel, there was a difference of opinion between your firm and clients with respect to when this fee was due. Isn't that correct? This 20% contingent fee provision you say is unambiguous, but there was a trial and there was testimony at the trial with respect to that issue. Isn't that correct? There was testimony, Judge, but I do not agree that they said or take the position that the money wasn't due until the property sold. That is totally... Go finish your sentence. I'm sorry. Go ahead. That is totally an opposite to what they did. Why did they pay $400,000 towards a fee that they didn't even know what it was or that would ever be due? There was correspondence that consisted of parole evidence. There was parole evidence that came in at the trial. Isn't that correct? Unobjected to with respect to all of the interactions surrounding the settlement and surrounding what your clients did and your interaction with the client. We agree that there was unobjected to parole evidence that came into this trial. Judge, I agree that there was evidence that came in through testimony of witnesses as to all of the facts and circumstances of the two agreements. And there were... Unobjected to exhibits as well. The book of exhibits came in. That was no objections to that. Well, that's true. There were no objections. There were no objections on either side to any of the exhibits because they were all clearly relevant to the determination of the agreements. Mr. Pinelli, in the firm's own correspondence that Mr. Burke signed off on 2011, 2013 and 2014, all of them state that quote, this firm is entitled to 20% of the sale price of the Camelot property less certain lawsuits. Correct? That's in those letters. That's what the letters state. Correct. And that was inconsistent with the reminder notices but consistent with Kim's testimony and consistent with the letter. The letter itself, not the attachments. Correct? Yes, I could see there's an inconsistency there. And whose responsibility is it to make clear what is due and when it's due? Is it the client's or the lawyer's? Well, I think it's both. When they both sign an agreement, there's no allegation here of duress, coercion, fraud, undue influence. These were sophisticated plaintiffs. They're all highly educated. They were all in real estate transactions well before the firm came along. There were negotiations. They were testified to. There was agreements signed by all of them. So both sides would have to My question is, isn't it the responsibility of the lawyer under the Rules of Professional Responsibility to make clear any disagreement about a fee in writing preferably? Well, there was no disagreement, Judge. There was no disagreement. They never signed the settlement. They never signed it. They didn't sign it, but they didn't object to it. They never contacted him and said, this is wrong. In fact, they went ahead and paid $400,000, which why would they have done that? I'm sorry, Judge. Was the language in the letters a mistake or a strivener's error? It wasn't a mistake. I think it's taken out of context. It's not the agreement. He's just saying that you owe this money. 20% of the sale price. Well, that's a term. I mean, you know, it's just a term he used. 20% as of 2004. It says 20% of the sale price, correct? I'm not disagreeing. That's what it says, Judge. I don't think it was intended to mean that you don't owe this money until the property sells. Nothing could be clearer from the evidence that they understood they had an obligation. They wrote it on the checks. Partial payment. Plaintiff Kim admitted it in his deposition. Yes, we knew we owed fees. That's why we paid it. I'm sorry. I'm sorry, Judge. I can't tell if I'm interrupting you. I apologize. It's breaking up for some reason and I can't hear you. I know. I'm sorry. My internet unfortunately wasn't for our first argument. It says it's unstable. I apologize. Counsel, there were three letters that were sent, February 9, 2011, December 5, 2013, July 17. Each of them stated the firm is entitled to 20% of the sale price of the Camelot property, less certain offsets. Sale price. That's what was put in those letters. Those letters were introduced into evidence. That's the parole evidence. Thank you. I'm sorry. I can't hear the justice. While we wait for her to come back to answer her question, let me ask this question. Counsel, did the firm, did the defendants ever complain about the listing price for the property when it was listed at $4 million, $5 million, $3.5 million, which clearly shows that the sale price was an important fact in this case. Did the firm ever object to those listing prices? We never were aware of them, Judge, at the time they were happening. We did not become aware of that the property was even being listed during that time period. It was only upon the filing of a lawsuit and discovery, so 2015 and later, that the plaintiffs disclosed for the first time that they had listings of the property. So we were not aware. They did not provide those to us during that time period. We did not become aware of them at or about the time the property was being listed. Is Justice Zinoff... I'm going to ask, could we pause for just a minute? I'm having difficulty there. This is happening quite often. I just want to make sure that I don't believe there's anyone else on using the Internet in my area, but if you wouldn't mind pausing for just a couple minutes, let me check, okay? Sure. Okay, and I apologize if this is one that you've answered, but it was just freezing off and on. I think what I was asking is, there are three letters that were introduced at the trial. The letters of February 9, 2017, 2014 letter. Each of them said, the firm is entitled to 20% of the sale price of the Camelot property less the offsets. Doesn't the sale price of the Camelot property mean the price when it's sold? How can it mean anything different? It doesn't, Judge. I think the reference that was made to the sale price was all of those letters occurred after the 2005 modification in which Mr. Burke agreed that they could pay the balance upon the sale of the real estate. So for the first time in 2005, it was agreed that they could defer payment of the balance until the sale of the real estate. So that's all it is as a reference to you don't have to pay this until the sale of the real estate, which was a modification of the original agreement. And that was signed, the modification, by all the parties. I've lost it. I have lost your answer. This has not ever happened to me before, certainly not during an oral argument. Presiding Justice Bridges, are we able, there's still so much of the argument to go and I really feel this is so important. We have to take a minute to see. Catherine, I believe you said you were not able to hear Mr. Pennelly's response. So why don't we remake the state your response to Justice Zinoff's question. Thank you. Thank you, Justice Bridges. My response is that those letters were written in 2011 and beyond after the agreement in 2005 was made, a modification to the agreement that allowed the plaintiffs to pay the balance of the attorney's fees owed after the sale of the property occurred. So that's why there's a reference to sale of the property in there because the parties had modified it from you owe it from the time of the settlement to now you could pay the balance after you sell the property because you made this initial payment of the fees of $400,000. So that's why that language is used. But now you could have included in this, you're referring to the addendum that the amount of the fee was $1,037,000 but you didn't and you could have included also that the balance due was $637,000 but you didn't do that either. Isn't that correct? It's not written in there, Judge, but there was testimony of conversations between Mr. Burke and Dr. Kim about discussions of the amounts and Dr. Kim could not recall the discussions. Mr. Burke was very clear about the discussions and there was no dispute that he knew of by the plaintiffs as to the amount due. So that's why it wasn't put in there because the parties were aware of it. Well, but that makes it a little bit difficult for us to review, does it not? I mean, the trial court listened to the testimony, certainly looked at all the evidence and made some and I assume judged some credibility here as well if you say that there was discussion and she had to listen to who said what to whom and make a decision based on some of that and what happened at the trial, obviously. Well, she did. I don't disagree with that, Judge. She did hear the evidence and reviewed the exhibits, but as you know from our briefs we believe she exceeded her authority because she reformed not just that provision of the contract but two others, which I'm not going to have time to discuss now but I will in rebuttal. Okay. I don't have any further questions of Mr. Pennelly. Again, my apologies. Okay. Thank you. Justice Burkett, do you have any additional questions? No, given the time, no. Mr. Pennelly, I want to thank you. At the end of the Appleese argument, you will have an opportunity for questions. At this time, Mr. William, you may begin your argument. Thank you, Justice Bridges. May it please the court. My name is Patrick Williams and I represent the plaintiffs, the three doctors, Dr. Tate Kim, Dr. Lee, and Dr. Kim. This morning, the first order of business is the defendant appellate's brief itself. The initial brief filed by the defendant on October 5, 2020 contained a multitude of Supreme Court rule violations involving the appendix, the statement of jurisdiction, the nature of the case, and especially the statement of facts. On October 27, 2020, plaintiffs filed a motion to strike and dismiss the appeal. On November 2, rather than responding to the motion to strike, the defendant filed its motion for leave to file a corrected brief and appendix. On November 6, we objected to the filing of the corrected brief and appendix. This court ruled on November 9 that the defendant was denied, but the plaintiffs were allowed to assert that the corrected brief should be stricken in whole or in part as part of their response brief, and we've done that. Now, the motion to strike and dismiss the brief is not a mere exercise in form over substance. The corrected brief included a statement of facts that is virtually identical to the original statement of facts, and therefore contains the same substantive deficiencies that clearly violate Supreme Court Rule 341H6. Defendants failed to present facts accurately and fairly without argument or comment or provide anything close to a complete picture of the evidence and testimony considered by the trial court. I think that's even been demonstrated here this morning by the questioning of the justices concerning these letters dating from September of, I'm sorry, September of 2005 and then going forward to 2011, 13, and 14. There's no reference anywhere in their brief to any of the letters of 2011, 13, or 14, which are pivotal in the court's determination of the trial court's determination of the rights of the parties, and those letters, they don't simply say that the balance of the fee will be paid upon the closing of the property. That's the 2005 letter. The three letters all say the same thing, that at the closing of the property, the fee will be based on 20% of the sale price. And again, nowhere is that contained in their brief, in their briefing, which again is a substantive failure to provide a complete picture of the evidence and testimony considered by the trial court. Counsel, I may agree with you regarding the brief in this case, but was there any evidence introduced in the hearing that the 20% was only to be determined by the sale of the property? Those letters, Your Honor, those three letters indicate that the sale price, when the property sells, obviously, we don't have a sale price until the property sells, but the three letters drafted by Mr. Burke indicate that that is when the fee will be determined, and the trial court properly found consistent with those letters. Mr. Williams, what about the argument that there was no, in your pleading, in the complaint, there was no request for reformation of the agreement, and the trial court erred by declaring other offsets, $200,000, for example. What's your response to that argument? Judge, your question was a little difficult to hear. The question was, was there a... I'm sorry. No request for reformation in your complaint. There was no reformation. That's something that the court generated, and we submit that's consistent with the brief they presented. If their statement of fact says that the agreements were unambiguous, and that there was no dispute as to any factual or evidentiary matter, then if the court finds contrary to their argument, then there must be a reformation. That's not what the court did. The court looked at the agreements, and it's not just the two agreements from 1996. It's the agreements in 1996, and then it's the settlement in 2004, and then it's the subsequent letters after in, I believe, April of 2004, and July of 2004, where there's a demand for payment of the fees, and then we go for a period of several years before there's any further communication at all, and then we have the letters in September I'm sorry, in 2011, 13, and 14, which kind of round out this fee agreement and what we have is precisely what the trial court found, that there will be a fee determination upon the sale of the property based on 20% of the sale price, that there will be certain offsets which the trial court found to consist of three elements the Martan fee, and Redesvet, I believe I'm pronouncing that right, the Redesvet settlement, and then the amount paid by Camelot. Those three amounts will be offset, plus the amount that they've already paid. Now, one of the things that came up I'm sorry, Judge. Excuse me, counsel, this is Justice Enoff. I know this is hard because you can't see me, but what happens if this property doesn't sell? Are the attorneys supposed to just wait forever to be paid? Judge, the property is obvious... I'm sorry. I know it's been listed a number of times, but this is quite a long time. There's an offer that's fallen through, but how long are the attorneys supposed to wait to be paid? Judge, if there has been an indication that the property has been listed continuously since the settlement in 2004, and the ups and downs of the market have been such that the property has not sold, and again, there really has never been an issue, frankly, as to whether or not the property is being marketed appropriately or listed at an appropriate price. Again, I understand the court's concern, but it's a factor of the real estate industry. Counsel's suggestion... I'm sorry, Judge. That takes me back to when the agreement was that the 20% was to be paid. Both sides agreed that 20% of the settlement meant 20% of the value of the property, so wouldn't it necessarily follow that the value would be determined as of the date of the underlying settlement? In other words, why would a law firm agree to postpone its fee indefinitely? That's a great question, Justice. It is something that is intriguing with all of this. This fee agreement started in 1996. That's a quarter of a century ago. They have never filed suit. They have never disputed the efforts being made to sell and list the property. I guess if there's an issue, Judge, about will the property ever sell, they could always move to have it auctioned off if there's some concern along those lines. That's kind of the last-ditch effort. In terms of the agreement, frankly, is the agreement. Mr. Burke from the defendant firm entered into this agreement. Frankly, the agreement as originally provided had no mechanism for determining when the fee would be paid, how it would be calculated, and when it would be due. Justice Burkett, if I might, let me ask just one more question. I'm sorry. Burke sent out a fee statement. If the plaintiff objected to the Burke's valuation on that fee statement, why didn't they immediately notify him, and then why did they sign this addendum without making it clear that these partial payments were just gratuitous? Judge, I don't know that there was ever any indication that the partial payments were gratuitous. The testimony at the hearing was that Mr. Tate Kim received a communication from Mr. Burke that they needed payment of their fees, which resulted in the September 2005 letter, which required a $300,000 payment, and if the property wasn't sold in six months, another $100,000 payment. The payment, under no circumstance, was ever characterized as gratuitous. It was a recognition that there were fees owed the firm, and this was intended to be a partial payment of those fees. As was brought up previously, there was never any kind of recognition or acknowledgement that the fees owed were $1,372,262 or anything close to that. Thank you. That was actually in part my question. Your argument is that the payment of the $400,000 was never an acknowledgement that the figure that was put in the addendums to the letters was agreed upon, correct? Correct. I mean, there was never any testimony other than the argument that's being advanced by the defendant firm that there was this agreement on the fees. There never was. Again, it's interesting that over the 25-year span that the Burke, Burns, and Pennelly firm have never instituted, sued, or taken any steps to address this issue. Keep in mind, Justices, the last iteration of their agreement was in 2014. This is when we know that the sale price, 20% of the sale price of the property will be due upon the closing of the property. That's what we know. Less certain offsets again. Frankly, that's what the court found. There's nothing that's happened in the last six and a half years to change that dynamic. Again, I think that's telling. The timeframes that we're talking about in this context are extraordinary. To claim like Mr. Pennelly is making the argument, well, we didn't know that the property was being listed. Frankly, I don't accept that. The testimony at trial was there was never any objection to either the listing of the property or the pricing of the property. That's what with the trial testimony, that's what the trial court considered. That's what the trial court ultimately determined consistent with the agreements that the trial court was presented with that was admitted into evidence. The only way that any kind of reformation, the only way that can even be considered is if the court accepts the version of the statement of facts and the version of the argument which we consider to be overly stilted and overly designed to create an impression that it is improper under the Supreme Court rules. I don't want to dismiss this notion that the appellant's brief is improper. Mr. Williams, let me ask you this. Let me ask you this, Mr. Williams. I know courts have rejected appraisals that are too remote in time, but in this case, doesn't the comparable wholesale support the validity of the settlement recovery amount? Well, Judge, again, that raises another very fascinating mathematical aspect of this. If the property is going to be valued at this $6,500,000 figure, and if the plaintiffs own half of the property, then you can't value their interest at $325,000 each. Now, interestingly, if you do the math, if you multiply $325,000 times the 20.2348 acres, which consists of the Camelot parcel, you come up exactly to the penny with the $6,576,310. And the trial court recognized this anomaly that you can't have the property valued at $6,576,000, but then for the 50% interest that is assigned to the plaintiffs, that only amounts to $325,000 each. Yeah, I noted that in your brief, but counsel, you argued that the defendant pulled this settlement amount out of the air. But when you read the entire record, when you view that and you see a lot of negotiations going on here, you see plaintiffs request for credit on the fee agreement, the plaintiffs agree to the amount owed, the plaintiffs have given the settlement statements, and they never object to it, but rather they offer evidence of the value of this property. Doesn't this establish some meeting of the minds on this settlement in the settlement agreement? I'm sorry, Judge, were you finished? No, go ahead. On the settlement agreement, doesn't it establish that? Again, the testimony was from Mr. Burke that he arrived at this figure, and it was an arbitrary figure based upon his analysis of the 1999 appraisal and some other comparables that he looked at. Dr. Kim testified that this was a figure that Mr. Burke gave him. That was his testimony. There was no negotiation. This was a number that Dr. Kim indicated was a value that Mr. Burke told him represented the ownership interest of Camelot for his share, for each of their shares, $325,000 each. But he initialed that on the retainer agreement. Did he not, this figure? No question. There's no question that in 1996, all three doctors signed off on a valuation for $325,000 for their interest. And if that's the case,  of the property in 1996, according to the math, we can't dismiss the math, was $1,950,000. So one of our arguments is that the Burke firm overvalued the property for purposes of their fee calculation, but undervalued it for purposes of the interest that each of the three plaintiffs held. Now, you know, you could say, well, this was just an arbitrary number that pulls that the parties agreed to with no particular understanding or it was the proverbial roll of the dice. Uh-uh. It's not the roll of the dice when you can calculate the same value that the plaintiff, I'm sorry, that the defendant firm ultimately utilized to the penny in arriving at their $6.5 million figure. So I apologize for interrupting you, but your time has elapsed. So please continue with answering and finish up Justice question. Well, the only if my time is up, I would ask that the decision of the trial court be affirmed. I believe that the decision of the trial court is consistent with the evidence presented at the trial. I believe that according to the manifest weight of the evidence standard, there is no basis for this court to overrule or reject the findings or the ultimate decision of the trial court. And I thank you for your time. Does either justice have any additional questions? I do not. No. Thank you. Thank you, Counselor. Mr. Penali, you may proceed with your rebuttal. You are muted, Mr. Penali. Thank you, Judge. I apologize for that. First of all, I would hope that the court doesn't strike our briefs or dismiss our appeal based upon the procedural arguments that counsel has made. Counsel, let me address that because that was raised in the brief. Counselor, I want you to address your brief. This court allowed you to refile a corrected brief and your second brief failed to correct the statement of facts. It has failed to correct those shortcomings that was pointed out. You didn't mention the two fact witnesses testifying at the trial. Can you explain why even after being given another option to redo the brief it wasn't corrected? Well, there were a number of deficiencies that were complained of. We did correct I think a number of them. Some of the citations counsel complained about in the record were not citations to the points that were being made. So, there was an attempt to correct the record as far as is the brief, is the factual statement sufficient for purposes of allowing this court to review the evidence and make a decision? I think it was. You had all the exhibits, all the testimony. You know, I think we tried. Mr. Pinelli, this is Justice Zinoff, but how can you say that these facts were fair and accurate when you never set forth a testimony of the witnesses? You waited until the very last paragraph to even mention that there was a second witness and just casually mentioned the first witness. So, how are we to consider your statement of facts as opposed to, let's say, a police statement of facts? Why is yours fair and accurate? Why should we even look at it at all, even if we don't strike the brief? Well, Judge, I think that again, you know, in our view the material facts in this case were pretty undisputed because of the fact it was dealing with the court interpreting written contracts that the plaintiffs agreed were not ambiguous. Never alleged they were ambiguous. The writings were the writings. So,  were on a lot of collateral issues that weren't material to the facts. I mean, we know what the facts were. We know when the agreements were signed. We know when the statement was made. The final settlement statement, we know it wasn't signed. These are the material facts in the case. Are you suggesting that we should ignore the testimony of the witnesses? No, no, Judge. I'm not suggesting that at all. I'm saying perhaps we didn't highlight the testimony as much as counsel did, but that's because he feels for his argument purposes that that was important testimony. You say there was no ambiguity in the settlement. However, you acknowledged during the opening argument that there was ambiguity. That the statement 20% of the sale price was inconsistent with the 2004 letter. Correct? No, Judge. Let me correct you if you misunderstood me. I did not agree or acknowledge that there's an ambiguity in these documents. The question was asked... The letters say 20% of the sale price. Right, but those letters, as I explained to the Justice's other question, are letters that are written after the 2005 modification that delayed the payment, the due date for the payment. Those letters all refer to that and come after the fact. So there's a conflating going on here of the sale date, the agreement to postpone the payment until the property sailed, which was made later. And the terms of the agreement in the first place. Those are two different things and that's what the evidence showed. And I think, you know, the great question that was asked of counsel, why would a firm enter into a free agreement with a never-ending or uncertain date for payment? Well, that is a great question. And I would also ask the question, which I think is a great one, why would these sophisticated businessmen who invested in real estate pay $400,000 if they didn't acknowledge that they owed fees in the first place? And that acknowledgement comes from the beginning, from the agreements in 97, and then counsel was wrong on his historical history there. The settlement was 2004 and it was within the year in 2005 that they paid this money. And then there was a gap period of time for the demand for the balance of it. In any event, I'm short on time here. Go ahead. Sorry. The plaintiffs never denied that they owed legal fees, but the question was how much and when they were, when the total amount was due. Isn't that correct? And so the  that they made would be on account, so to speak, but didn't go to acknowledging specifically their position about when it was due was different than your firm. That's not correct, Judge, because if you look read the language of the agreement, the modification that they signed in 2005, it says it doesn't say this is a just a preliminary, a down payment or preliminary. It says this is a partial payment on fees owed. And they signed the check. The notation on the check says that as well. So why would they do that if they didn't have an obligation to pay until the property sold? That doesn't make sense. And it's inconsistent with their own actions. The last two points I want to make, because we haven't talked about them, but this credit of $206,000 that the court out of thin air gave them, they can't take the position, we didn't sign the final settlement statement and then take the benefit of it because those credits, the $206,000 and the $410,000, $15,000, those were put in there by Mr. Burke because of the settlement. They're not in the fee agreements. They weren't entitled to them. He did that because he felt that was the fair thing to do under the circumstances. So if they don't sign the settlement, the final statement, how can they take the benefit of it and take those credits? They really shouldn't be able to if that's the position they're going to take. Counsel, if I can go back to the argument that you made that why would they make the payment? I believe the doctor explained that in the record on C-154 when they talk about that the firm had done a good job. They felt they were morally obligated to make the payment. They realized that based upon the percentages that was owed, that they owed some money and they essentially said because they had a rough idea of the 20% of the recovery that they figured that they owed the firm money so they gave him $300,000 and later on demand an additional payment of $100,000. I think the witnesses in this case testify why that it wasn't a gratuitous $400,000 that they knew they owed something and there was a demand being made by your firm or by the firm. Judge, I agree with you 100%. Nobody's suggesting it was a gratuitous payment. I'm suggesting why if Mr. Kim's which he testified at trial we didn't have to pay anything until the property sold. That was the deal from the beginning when they signed these. If that's correct, then why would they make a payment at all? That doesn't make sense. They should be saying to Mr. Burke Mr. Burke, we don't have to pay you anything until the property sells. Again, these are sophisticated businessmen. Mr. Penali, is your argument that that payment was an admission that they owed the money that was in the 2004 letter? Yes. I think it's an admission and it's conduct consistent with the determination that when they signed this agreement they knew they owed money as of the time of the settlement. That's when the fee should have been calculated. Justice Bridges' point brought out a good point about Dr. Kim did his own analysis and came up with the property's worth at least $5.5 million so I'll pay you $400,000. All of the evidence in the record, and they didn't put any in to contradict the value of this property. All of the evidence in the record shows that the property was valued at or about the value on the final settlement statement and supports that. My last point, I'm $325,000 ready. You're out of time, but I do have a question and maybe the other justice as well. You argue in your brief that the trial court reformatted the retaining agreement, but didn't your cross-examination of the doctor introduce parole evidence to show that the parties intended the 20% fee to be based on the sale of the property? Those were the questions that were asked of the doctor and that was his response. You argue reformation of the contract, but didn't the judge just accept the evidence presented? No, Judge. I don't agree that the questioning opened up the door to reformation. The questioning was done to test credibility for other purposes. I'm taking the position that the judge didn't reform the contract if the judge considered the evidence that was offered during the hearing. No, because the law is that they have to plead reformation. The law is there are certain elements that have to be proven, fraud, duress, so forth and so on, before a contract can be reformed. The judge, and again, we cite the three instances in her finding, she changed those terms of the contract. She changed them. That's reformation. She can't change them unless it's pled and there's evidence of a basis to reform the contract. The plaintiff's own admissions throughout their briefs and throughout the testimony is we're not contesting the language of the contracts. We're not saying anybody forced us to do this. Even the judge commented I don't think there was any bad faith going on here or that anybody was trying to pull the wool over anybody's eyes. Given all of that, Judge, the only way you can allow these three declarations that the court made was to reform the contract. That's the only way it can be done. Thank you, Mr. Pinelli. I have no further questions. Do either of the justices have any additional questions? No, I do not. The court thanks both parties for your arguments this morning. The case will be taken under advisement and a disposition will be rendered in due course. Mr. Clerk, you may close the case and terminate these proceedings. Thank you, Your Honor.